UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OMNICOM GROUP, INC.,

    Plaintiff,                                                     Civil Action No. 10-CV-11969

vs.                                                        HON. BERNARD A. FRIEDMAN

880 WEST LONG LAKE
ASSOCIATES, LLC,

    Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

        This matter came before the court on July 5-8, 2011, for a non-jury trial. Having heard the witnesses, reviewed the trial exhibits, and considered the parties' arguments, the court is now prepared to issue its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1).

        The background of the parties' dispute in this matter, the critical questions of fact, and the applicable legal standards were summarized as follows in the court's March 25, 2011, Op. and Order Den. Pl.'s Mot. for Partial Summ. J. [docket entry 55]:

> This is a declaratory judgment action involving a commercial lease. Plaintiff Omnicom Group, Inc. ("Omnicom") is the guarantor of the obligations of the tenant, BBDO Detroit, LLC ("BBDO Detroit"), an advertising company which is the successor-in-interest of the original tenant, Ross Roy Communications, Inc. Defendant 880 West Long Lake Associates, LLC ("880 West Long Lake") is the successor-in-interest of the original owner and landlord, Troy Corporate Center Associates, LLC. The lease, a copy of which is attached to defendant's counterclaim as Exhibit 1, is for a 240-month term, commencing January 1, 2000, of a 186,565 square foot office building located at 880 West Long Lake Road in Troy, Michigan.
> 
> By letter dated July 30, 2009, Chrysler's chief procurement officer notified BBDO that it was terminating its contract with BBDO Detroit, LLC, BBDO Windsor, Inc., and BBDO Mexico S.A. de C.V. *See id.* Ex. 5. In April 2010 BBDO Detroit notified the landlord that "we and our affiliates no longer provide any advertising services to

Chrysler and its affiliates" and that "in accordance with Section 3.3(a) of the Lease, we are hereby exercising our right to terminate the Lease by providing you with six months' prior written notice." *Id.* Ex. 7. The landlord responded by indicating that the lease termination was ineffective because, among other reasons, "evidence is required that Tenant and its affiliates no longer provide advertising services to either of Daimler AG or its affiliates or Chrysler LLC or its affiliates." *Id.* Ex. 8.

Plaintiff seeks a declaration that, under the circumstances described above, BBDO Detroit was entitled to terminate the lease early and that plaintiff's only obligation is to pay the contractual early termination fee. In its counterclaim, defendant seeks a declaration that BBDO Detroit may not terminate the lease early and that plaintiff, as guarantor, must continue to meet BBDO Detroit's lease obligations.

\* \* \*

Plaintiff's motion for partial summary judgment seeks the court's construction of the all-important early termination clause of the lease. This clause states, in relevant part, as follows:

> 3.3(a) Notwithstanding anything herein contained to the contrary, in the event Tenant and/or its affiliates then no longer provides any advertising services to Daimler Chrysler AG and/or its affiliates, Tenant shall have the right to terminate this Lease at any time effective on or after the tenth (10th) anniversary of the Commencement Date. . . . In addition, Tenant shall supply Landlord with a copy of any notice from Daimler Chrysler AG terminating Tenant's services within ten (10) days after receipt thereof, . . . .

The disputed terms are "affiliates" and "Daimler Chrysler AG." Plaintiff argues that "the term 'affiliates' is limited to companies that control or are controlled by each other, and companies that are under common ownership and control and also share management and financial interdependence"; and that "the term 'Daimler Chrysler AG' means the Chrysler Group LLC." Br. in Supp. of Pl.'s Mot. for Partial Summ. J. at 20. Defendant argues that the term "affiliates" encompasses not only companies which control or are controlled by one another but also those which "are under common ownership or control (i.e., 'sister companies')"; and that "Daimler Chrysler AG"

2

means "Daimler AG." Def.'s Resp. Br. at 11, 17.

The legal standards governing the court's task are well known. As the Sixth Circuit has explained them,

> [i]n Michigan, "[t]he proper interpretation of a contract is a question of law." *Coates v. Bastian Bros., Inc.*, 276 Mich.App. 498, 741 N.W.2d 539, 2007 WL 2452721, at *2 (2007) (*citing Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 664 N.W.2d 776 (2003)). "That contracts are enforced according to their terms is a corollary of the parties' liberty to contract." *Id.* (*citing Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 703 N.W.2d 23, 30 (2005)). "The goal of contract construction is to determine and enforce the parties' intent on the basis of the plain language of the contract itself." *St. Clair Med., P.C. v. Borgiel*, 270 Mich.App. 260, 715 N.W.2d 914, 918 (2006). Michigan courts "examine[ ] contractual language and give[ ] the words their plain and ordinary meanings." *Coates*, 276 Mich.App. 498, 741 N.W.2d 539, 2007 WL 2452721, at *2 (emphasis added). "If the language of the contract is unambiguous, [the court] construe[s] and enforce[s] the contract as written." *Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 666 N.W.2d 251, 259 (2003). If the contract language "is ambiguous, testimony may be taken to explain the ambiguity." *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 702 N.W.2d 106, 113 (2005). "Only when contract language is ambiguous does its meaning become a question of fact." *Coates*, 276 Mich.App. 498, 741 N.W.2d 539, 2007 WL 2452721, at *2 (*citing Port Huron Ed. Ass'n v. Port Huron Area Sch. Dist.*, 452 Mich. 309, 550 N.W.2d 228, 237 (1996)); *accord Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 663 N.W.2d 447, 453-54 (2003).
>
> "A contract is ambiguous if 'its words may reasonably be understood in different ways.'" *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 228 Mich.App. 486, 579 N.W.2d 411, 414 (1998) (emphasis added) (*quoting Raska v. Farm Bureau Ins. Co.*, 412 Mich. 355, 314 N.W.2d 440, 440 (1982)). In other words, a "contract is ambiguous when its

> provisions are capable of conflicting interpretations." *Klapp*, 663 N.W.2d at 453 (Mich. 2003). Courts "cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare ambiguity." *Id.* "Instead, contracts must be 'construed so as to give effect to every word or phrase as far as practicable.'" *Id.* (*quoting Hunter v. Pearl Assur. Co., Ltd.*, 292 Mich. 543, 291 N.W. 58, 58 (1940)). However, "[c]ourts may not impose an ambiguity on clear contract language." *Coates*, 276 Mich.App. 498, 741 N.W.2d 539, 2007 WL 2452721, at *2 (*citing City of Grosse Pointe Park*, 702 N.W.2d at 113).

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543-44 (6th Cir. 2007).

\* \* \*

> Assuming arguendo that the operative language . . . is ambiguous, the Court can look to parol evidence to construe it as long as that evidence is not inconsistent with the written words. *See Ditzik v. Schaffer Lumber Co.*, 139 Mich.App. 81, 360 N.W.2d 876, 880 (1984) ("The 'parol evidence rule' operates to exclude evidence of prior contemporaneous agreements, whether oral or written, which contradict, vary or modify an unambiguous writing intended as a final and complete expression of the agreement."); *Detroit Bank & Trust Co. v. Coopes*, 93 Mich.App. 459, 287 N.W.2d 266, 269 (1979) (noting that the test for the admissibility of parol evidence "is whether the proffered parol evidence is inconsistent with the written language") . . . .

*United Rentals (North America), Inc. v. Keizer*, 355 F.3d 399, 405-06, 409-10 (6th Cir. 2004).

The court found, and still finds, that the words "affiliates" and "Daimler Chrysler AG" are ambiguous and must therefore be interpreted with the assistance of parol evidence. As the court noted in its earlier opinion,

4

> [b]oth terms are ambiguous and the ambiguity cannot be clarified by reference to the lease itself. Regrettably, although the parties indicate that this multi-million dollar deal was negotiated over a period of months by experienced business people with the assistance of counsel, the lease does not define either of these critical terms. Other terms were specifically and carefully defined, *see, e.g.,* ¶ 5.2 (defining "expenses," "base expenses," "additional expenses," "taxes," "base taxes," "additional taxes," and "tenant's share"), and yet "affiliates," which has no precise legal definition, and "Daimler Chrysler AG," which no longer exists, were left hanging.

Having listened to the witnesses' testimony and reviewed the trial exhibits, the court finds and concludes in regard to § 3.3(a) of the lease that the parties intended (1) for the phrase "Tenant and/or its affiliates" to mean the tenant (BBDO Detroit) and/or any of the other Omnicom-owned companies which were capable of providing the same type of advertising services to Chrysler Corporation ("Chrysler") as the tenant and its predecessor historically had provided to this client, and (2) for the phrase "Daimler Chrysler AG and/or its affiliates" to mean Chrysler and/or Chrysler's affiliates or brands, i.e., Dodge, Plymouth, Eagle and Jeep.

The court reaches these conclusions based on the testimony and documentary evidence which, by a clear preponderance, showed that BBDO Detroit was an advertising company, with several hundred employees, which serviced primarily a single client, Chrysler. The purpose of § 3.3(a) was to allow the tenant to terminate the lease early (as early as ten years after commencement of the lease) in the event that the tenant lost that client. The court finds that both landlord and tenant understood that if tenant lost Chrysler as a client, tenant most likely would be out of business and would have no use for the leased premises. Landlord understood that tenant wanted to lease the premises at issue in this case – which landlord built out specifically for tenant – in Troy, Michigan, so that tenant could be geographically close to Chrysler's offices in nearby Auburn Hills, Michigan. At the same time, the parties also understood that landlord needed

assurance that tenant would not take unfair advantage of the early termination clause by shifting its Chrysler business to a related entity (i.e., any of its "affiliates") and then claim it was no longer providing Chrysler with such services. Evidence at trial indicated that tenant is one of more than 1,000 companies owned by Omnicom. Landlord understandably wanted to prevent tenant from escaping its lease obligations by simply moving the Chrysler business to any of these other Omnicom companies. As landlord's counsel, William Zousmer, testified at trial, landlord's goal in including the word "affiliate" after tenant was to prevent tenant from "shift[ing] *the work*" – i.e., the work it was doing, and always had been doing, *for Chrysler* – to another Omnicom company. Tr. Vol. III (7-7-11) at 15 (emphasis added). The court finds that "tenant and/or its affiliates" was not intended to mean "Omnicom and/or its affiliates," as Omnicom's various companies perform other types of services besides advertising, including marketing and public relations. Only the Omnicom companies to which BBDO's advertising work could be shifted were included in the parties' understanding of BBDO's "affiliates." As the landlord's principal, Michael Kojaian testified, referring to BBDO Detroit's and Ross Roy's advertising business for Chrysler, "It was our intention that . . . jobs could not [be] shifted or business couldn't be shifted to other Omnicom subsidiaires in India or Germany or across the bo[]rder in Canada. It was the intention of the parties and it was our intention to capture all of *that business.*" Tr. Vol. II (7-6-11) at 237 (emphasis added).

It is also clear, from a preponderance of the credible trial evidence, that the parties intended for the phrase "Daimler Chrysler AG and/or its affiliates," as it appears in § 3.3(a) of the lease, to mean Chrysler and the Chrysler brands for which tenant and its predecessor, Ross Roy, had been performing advertising services for decades. As noted above, landlord knew that Chrysler was tenant's primary and most important client, and landlord sought to ensure that tenant would not shift

6

its Chrysler business to another Omnicom advertising agency. Landlord's knowledge that Chrysler was tenant's primary client, as well as landlord's intent to prevent such a shift, is apparent from the parties' lease negotiations, which ran approximately from the end of September until the end of December 1998. In the original lease proposal dated September 24, 1998, landlord suggested the following term: "In the event Ross Roy [DDBO Detroit's predecessor] no longer provides any advertising services to Chrysler Corporation, Ross Roy shall have the right to terminate the Lease . . . ." Jt. Tr. Ex. 8. In subsequent lease drafts (or in riders thereto), this early termination concept was articulated in § 3.3(a). "Ross Roy" was substituted by "Tenant and/or its affiliates," and the words "and/or its affiliates" were added after "Chrysler Corporation." *See* Jt. Tr. Ex. 14, 15, 17, 18, 20, 23, 26, 29, 30. In revised drafts dated November 5, November 16, and December 2, 1998, this proposed lease language remained unchanged: ". . . in the event Tenant and/or its affiliates then no longer provides any advertising services to Chrysler Corporation and/or its affiliates, Tenant shall have the right to terminate this Lease . . ." *See* Jt. Tr. Ex. 34, 36, 43.

   The change from "Chrysler Corporation" to "Daimler Chrysler AG," first appeared in a draft that was faxed by landlord's counsel, William Zousmer, to tenant's counsel, John Seligman, on December 8, 1998. *See* Jr. Tr. Ex. 44. While the evidence on this point was in conflict, the court finds that the reason landlord requested the change, and the parties' intent in agreeing thereto, was that at this time Daimler AG was in the process of acquiring Chrysler by merger, and therefore the new corporate name (DaimlerChrysler AG) should replace "Chrysler Corporation," as the latter would soon cease to exist as an independent corporate entity. The purpose and intent of the change was not, as some trial testimony suggested, to make it more difficult for tenant to terminate early by including Daimler AG and its affiliates (in addition to

7

Chrysler and its affiliates) among the entities for whom tenant and its affiliates would have to cease performing advertising services. The court finds that the change from "Chrysler Corporation" to "DaimlerChrysler AG" was, in short, a change in name only, not a change in the scope of the early termination clause.

As Mr. Zousmer testified, the change came about "near the end of the process. And I received a call from Mr. Kojaian that *he did not believe that Chrysler Corporation was a proper entity* . . . to be used in this clause; that Chrysler was then about the finalize or had finalized a transaction with the Daimler-Benz in which the companies were combined." Tr. Vol. III (7-7-11) at 29 (emphasis added). Mr. Zousmer's reaction to Mr. Kojaian's suggested change was "[e]mbarrassment. I should have picked that up myself and made that change, but I didn't." *Id.* at 30. Mr. Zousmer's embarrassment was understandable, as the proposed merger had been well publicized and it would have been an obvious mistake to continue the reference in the lease to the old corporate name, Chrysler Corporation. The court rejects the testimony of Messrs. Zousmer, Kojaian and Haboian that landlord, by proposing the name change, also intended to fundamentally change the scope of the early termination clause. There would be no cause for "embarrassment" if there were a substantive reason for the proposed change, as opposed to correcting an oversight which counsel should have caught himself. Moreover, the weight of the credible evidence supports the tenant's position that if tenant had understood that landlord proposed the change from Chrysler Corporation to DaimlerChrysler AG in order to "capture" Daimler and its affiliates, in addition to Chrysler and its affiliates, tenant never would have agreed to the change.

The landlord's representatives testified that tenant agreed to this massive enlargement of the scope of the entities for which tenant and its affiliates could not perform advertising services

8

and that, as a quid pro quo for this agreement, landlord agreed to various concessions, e.g., reducing the fee tenant would have to pay in the event of early termination, liberalizing the tenant's subletting rights, and assuming tenant's ownership interest in another building. The court did not find this testimony to be credible. The weight of the evidence simply does not indicate that any such quid pro quo occurred. The court found much more credible the testimony of tenant's representatives to the effect that tenant never would have agreed to further restricting its ability to terminate the lease early by including Daimler AG and its affiliates (the identity of which tenant did not even know) within those companies, in addition to Chrysler and its affiliates, for which it would have to stop doing business. The "concessions" listed by landlord were, the court believes, merely part of the "horse trading" that commonly occurs during the negotiations of large business deals such as this.

Testimony from tenant's counsel, John Seligman, supports the court's conclusions regarding the parties' intent in agreeing to the phrase "tenant and/or its affiliates." During the negotiations, Mr. Seligman sought in written comments in October 1998 to "exclude affiliates, or confine it to affiliates located in the building." Jt. Tr. Ex. 26. In a subsequent telephone conversation, David Haboian, the landlord's vice-president of brokerage and lead negotiator, told Mr. Seligman that "they didn't want us to – 'us' meaning the tenant – to be able to either, as he put it, move down the street and set up shop or shift the work to another local agency and say it was no longer being done by Ross Roy. And they needed that protection for the local community. As long as the work was being done for Chrysler there, we were on – the tenant was on the hook for the lease." Tr. Vol. II (7-6-11) at 21. Mr. Seligman testified that he and Howard Wendy, Omnicom's broker, who also participated in this telephone discussion, "thought it was a reasonable explanation and a reasonable protection to ask for, for a landlord." *Id.* at 22. Based on this conversation, Mr.

9

Seligman believed that the phrase "tenant and/or its affiliates" referred to the tenant and other local advertising agencies. Mr. Seligman testified that he and Mr. Wendy accepted this explanation and never again discussed the issue. *Id.* at 22-24.

Mr. Seligman testified that the phrase "Chrysler and/or its affiliates," as it appeared in the drafts of the lease, referred to Chrysler and its models, such as Dodge and Jeep. Tr. Vol. II (7-6-11) at 28. When landlord changed this phrase to "Daimler Chrysler AG and/or its affiliates," Mr. Seligman asked landlord's counsel, Mr. Zousmer, "why the change was made. And he said I think we ought to get the current name correct for the company. . . . I took him at his word and we moved on." *Id.* at 31. As far as Mr. Seligman understood, the change was merely a name change, not an enlargement of the entities to which the termination clause would apply. *See id.* at 32, 62. Mr. Seligman's understanding was reflected in his notes, from approximately one week after this change, in which he wrote "option to cancel *if lose Chrysler* . . ." Jt. Tr. Ex. 39 (emphasis added). Again, the court finds that this understanding is consistent with the credible evidence.

Mr.Wendy testified that he never discussed the change from Chrysler to DaimlerChrysler with landlord's principals and that the only automobile company he did discuss with them was Chrysler because "that was the main client of this whole group. And if we lost Chrysler, we, we have to have an out." Tr. Vol. II (7-6-11) at 81. Wendy denied ever discussing the change and, in fact, he testified he was unaware of it. *See id.* at 96-99, 103. While Mr. Wendy was at times somewhat inattentive regarding certain lease terms counsel were negotiating, it is clear that he would not have agreed, and did not agree, to further restrict tenant's ability to terminate early by adding Daimler and its affiliates, in addition to Chrysler and its affiliates, to the companies for which tenant would have to stop performing advertising services prior to exercising the early

termination right.  Mr. Wendy's testimony was that "the deal I came out to do was with Chrysler Corporation," and that he did not discuss and would not have agreed to including Daimler and its affiliates within the early termination clause.  Tr. Vol. II (7-6-11) at 98-99.  This is credible and consistent with the evidence.

Mr. Haboian testified that by using the word "affiliates" landlord intended to make it very difficult for the tenant to terminate the lease, as the clause would include "any entity that was under the common control or common ownership of the tenant and/or Chrysler Corporation or Omnicom, the guarantor."  Tr. Vol. II (7-6-11) at 145.  However, Mr. Haboian conceded that the landlord's concern was that Omnicom entities "could transfer this business *with Chrysler* to one of those other affiliates."  *Id.* at 149 (emphasis added).  In explaining why landlord wanted the early termination clause to apply not only to tenant but also its affiliates, Mr. Haboian stated: "Well, again, the tenant has, you know, all these different companies, from PHD to Organic, and BBDO and Ross Roy and all these other affiliates that are all providing advertising services *to Chrysler*. So again, we needed to capture every one of *those entities*."  *Id.* at 150 (emphasis added).

Regarding the landlord's purpose in changing Chrysler to DaimlerChrysler AG, Mr. Haboian testified that "[w]e had to, number one, pick up the correct entity which was now Daimler AG.  And further it broadened or expanded the restriction of the termination right to include the full entity of Daimler Chrysler AG as oppose[d] to Chrysler Corporation."  *Id.* at 164.  However, Mr. Haboian also testified this "was a *natural change* to the document.  It was a result of what was announced, namely that the merger between Daimler and Chrysler and they were opposed to it." *Id.* at 168 (emphasis added).  Mr. Hoboian believed the change included "[a]ll the affiliates of DaimlerChrysler AG," not just the affiliates of Chrysler. *Id.* at 171.  Mr. Kojaian testified similarly.

11

The court does not believe that the tenant ever agreed to the landlord's expansive definition of the word "affiliates." Mr. Haboian testified that landlord "wanted the word to be as [broad] and open ended as possible so it was all encompassing." *Id.* at 203. Under his "common ownership and control" definition, all companies owned or controlled by Omnicom are affiliates of BBDO Detroit. *Id.* at 207. And therefore early termination would not be permitted if any Omnicom company does any advertising work for any company owned or controlled by DaimlerChrysler, including the entities which acquired Chrysler following its "divorce" from Daimler and its subsequent bankruptcy. *Id.* at 208, 219. There is no credible evidence suggesting that tenant ever accepted this extremely expansive definition of tenant's and DaimlerChrysler's "affiliates."

The landlord expressed its understanding of the scope of the early termination clause in an email message from Mr. Haboian to representatives of the landlord's mortgage lender, Bank of America. The message, dated December 16, 2009, states:

> Carrie and Ed:
>
> I apologize for the delay in getting back to you, however these are extremely difficult days and I am trying to put out as many fires as possible. As you know, BBDO exercised their right to terminate their lease at the 840 building and we are expecting them to terminate their lease at the 880 building as well. *It has been well publicized that they lost their contract with Chrysler (see attached articles), which gives them the right to terminate the 880 lease. Since Chrysler is the only account they handle out of this office, we are certain they will be exercising this right.* In fact, they are in the process of vacating the building. We do not have any prospects at this time, nor do we have a business plan to make up for the rent deficiency. I will get back to you after the first of the year, however in the meantime it is safe to say the building will be completely under water next year.

Jt. Tr. Ex. 121 (emphasis added). Had landlord believed that tenant did not have the right to terminate, surely landlord would have indicated this belief to its mortgage lender. Conspicuously

12

absent from this email message is any suggestion by the landlord that tenant was exercising its early termination right improperly, i.e., because some other Omnicom company might still be doing advertising work for some Daimler-related company somewhere in the world. Rather than making such an argument to its lender, landlord openly conceded that tenant had the right to terminate the lease early because it had lost its only client, Chrysler.

The court finds and concludes that § 3.3(a) of the lease was understood by both parties as an "anti-cheating" provision which prevented tenant from terminating early so long as tenant or another Omnicom company performed advertising services for Chrysler or its brands. This is apparent from the parties' course of dealing (including the lease negotiations), the testimony of their representatives, the purpose of the lease, and the other documentary evidence. As the evidence clearly established that no Omnicom company was performing any work for Chrysler on the date of termination (i.e., six months after tenant gave notice to landlord that tenant was exercising this right), the court also finds and concludes that the termination was effective on that date.[1]

Finally, the court finds and concludes that tenant complied with § 3.3(b) of the lease, which requires it to pay a substantial early termination fee "[e]ffective upon such termination and as a condition precedent thereto . . ." The court interprets this provision as requiring the fee to be

---

[1] BBDO Detroit's chief operating officer, Peter Swiecicki, testified that he took an "ultra-conservative approach" in interpreting "tenant and/or its affiliates" and went to great lengths to ensure that no Omnicom company was doing any advertising business with Chrysler anywhere in the world. Tr. Vol. I (7-5-11) at 116. Mr. Swiecicki used Excel spreadsheets to monitor all advertising business being done worldwide by Omnicom companies for Chrysler and its affiliates. All such business ceased by April 7, 2010. Tr. Vol. I (7-5-11) at 120-22. Mr. Swiecicki later learned that two Omnicom companies were performing some non-advertising work for Chrysler after the effective date of termination. *See id.* at 123. The unrebutted evidence was that all *advertising work* by all Omnicom companies had ceased prior to the effective date of termination. Accordingly, the early termination of the lease was proper.

paid upon the effective date of the termination, not on the date when tenant gives the six-month advance notice of termination. The undisputed evidence at trial was that tenant paid this fee, in the approximate amount of $7 million, on the effective date of the termination (October 8, 2010), as § 3.3(b) required.

        The court shall enter judgment for plaintiff in accordance with these findings and conclusions.

Dated: July 20, 2011  
    Detroit, Michigan

s/Bernard A. Friedman  
BERNARD A. FRIEDMAN  
SENIOR UNITED STATES DISTRICT JUDGE